**Susan K. STEVENS, Plaintiff,**

v.

**DEL WEBB COMMUNITIES, INC., Defendant.**

**C.A. No. 9:05–2657–PMD–GCK.**

United States District Court, D. South Carolina, Beaufort Division.

Sept. 8, 2006.

---

Robbie M. Nichols, Berta E. Nichols Law Office, Hilton Head, SC, for Plaintiff.

Jeffrey A. Lehrer, Ford and Harrison, Spartanburg, SC, Leanne C. Mehrman, Ford and Harrison, Atlanta, GA, for Defendant.

### ORDER

DUFFY, District Judge.

This matter is before the court upon the Magistrate Judge's recommendation that this court grant Defendant Del Webb Communities, Inc.'s ("Del Webb" or "Defendant") motion for summary judgment. The record includes a Report and Recommendation ("R & R") of a United States Magistrate Judge, which was made in accordance with 28 U.S.C. § 636(b)(1)(B). A party may object, in writing, to an R & R within ten days after being served with a copy of that report. 28 U.S.C. § 636(b)(1). Plaintiff has filed timely objections to the R & R.

### BACKGROUND

On September 15, 2005, Plaintiff Susan K. Stevens ("Stevens" or "Plaintiff") filed her complaint against Defendant, wherein she alleges that she was disciplined and ultimately terminated on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* On October 7, 2005, Del Webb answered Plaintiff's complaint, denying Plaintiff's substantive allegations. Thereafter, on April 10, 2006, Del Webb filed a motion for summary judgement, to which Plaintiff filed a response in opposition. Del Webb filed a reply to Plaintiff's response. Subsequently, at the request of the Magistrate Judge, the parties filed a joint factual brief. On June 20, 2006, the Magistrate Judge filed a 34–page R & R recommending that this court grant Del Webb's motion for summary judgement.

Plaintiff filed objections to the R & R on July 10, 2006, and Defendant filed a response to Plaintiff's objections.

Pursuant to the parties' joint factual brief, the parties have agreed upon the following facts:

In January of 2003, Glenda Morgan ("Morgan"), Vice President of Sales for Del Webb, interviewed and hired Plaintiff as a sales associate; the employment relationship was at-will. During Stevens' tenure with Del Webb, all three of her supervisors, Morgan, Elizabeth Cain ("Cain"), and Joanne Sutcliffe ("Sutcliffe"), were women. On her first day of work, Stevens received and signed a job description setting forth her duties as an employee. This job description required Stevens "to communicate properly to the appropriate departments any customer request for information or services" and "to work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission."

Del Webb paid Stevens on commission for performing her job duties, which included showing and selling single-family homes, condos, and lots in Del Webb's Sun City development in Hilton Head, South Carolina. During the first year of Stevens' employment, she and a male sales associate, Art Kelly, became partners. Kelly and Stevens shared all commissions and split the seven-day work week so that one of them was in the office every day. It is undisputed that Kelly and Stevens were among the top in sales for their category.

During Stevens' employment, Del Webb conducted weekly sales meetings, at which management provided the staff with information regarding pricing, lot releases, home standards, and other business con-

cerns. Morgan preferred that sales associates, regardless of their sex, did not raise issues in sales meetings because one of the reasons for sales meetings was to inspire the sales associates to prepare them to make sales. Stevens believed that during these meetings, management, particularly Morgan, "never cared to have any input from the sales people ... Very unopen to any kind of new ideas, therefore if you broached a new subject with them[,] they would try to put you in your place, so to speak." Stevens claimed that even when male sales associates raised issues, management "might not always be nice about it, but sometimes they would say well, see me about that later...." Stevens believed that Jack Tuney ("Tuney") could verify that "[Morgan] was never one to solicit opinions from salespeople and that when they did it would get shut down." Stevens testified that Tuney had "learned not to say anything because he was afraid of [Morgan] as well." Tuney testified that "Stevens and I would both speak very openly in meetings, the morning meetings. I learned to stop. She never did."

Early in her employment, Stevens was counseled following a sales meeting in which she openly challenged management's pricing decisions. One of her supervisors, Cain, verbally warned her that the company "would not tolerate salespeople being disruptive, that it was none of [her] business how [properties were] priced, and if [she] was disruptive like that in the future she could be asked to leave."

At some point, Stevens informed management that "in California[,] we wouldn't dream of building a house without a smooth ceiling because you could never sell it." Stevens testified that she "would throw [this criticism] in a lot," so much so that it became a "joke" within the office and her co-workers began to refer to smooth ceilings as "California Susan ceil-

ings." Ross Turpin stated that "[i]t seemed like in a majority of the sales meetings, [Stevens] would raise the issue of popcorn ceilings. She would not let it drop." Also, Reid McCall testified that "Stevens repeatedly brought up the issue of popcorn ceilings during sales meetings." Greg Price stated that, "[w]hile other sales associates may be outspoken, the difference was that [Stevens] was not outspoken in a diplomatic way. For example, when bringing up popcorn ceilings, she would say 'my customers do not like them' and 'that is not how they do it in California' in a tone of voice that was not diplomatic."

Stevens expressed her belief that the Sun City Development was "20 years behind the times." Stevens explained that Morgan did not understand that the property was behind the times because "she [was] not from the west where the west is more progressive in home building. California typically sets the standard for the rest of the country in home building contracts and everything else." One of Stevens' co-workers stated that "if a manager disagreed with her, she would say that out in California, we did it this way." Reid McCall testified that "Stevens could come across very mean during sales meetings," and Carole Richardson testified that she "truly remember[ed Stevens] as being challenging in sales meetings."

Stevens' managers believed that she disrupted sales meetings by engaging in distracting conversation with co-workers. On one occasion, Stevens disrupted a meeting by talking with a co-worker, and at the next meeting, Morgan asked Stevens to sit in front with her so she would not talk. Ross Turpin stated that while he believed that separating Stevens "was totally unprofessional, this may have been a knee jerk reaction to [Stevens'] constant badgering." Turpin stated that a couple of

times, he had been afraid that Stevens would be asked to leave the meeting.

Melba Burns Windham thought being separated was humiliating for Stevens. While Windham felt that Morgan "relates better to men than she does with women," Windham believed that "we all relate to a particular gender better than we do to the other," and that it is "not necessarily a negative or a positive." Windham testified that Morgan was a good manager and that she did not think Morgan was capable of deliberately discriminating because of "sex, race, or anything like that." Stevens testified that she was not humiliated by being separated at the meeting because she was "pretty thick skinned." During the sales meetings that Stevens attended, she did not recall male sales associates being asked to sit in the front of the room. However, Morgan recalls asking male sales associate Mike Martin to move to the front of the room to prevent him from talking during a meeting, and Veronica Cadman recalls Morgan asking male associate Rick Malone to move to the front of the room during a sales meeting. According to Plaintiff, on other occasions, Morgan sat between male associates to prevent them from talking during meetings.

On March 31, 2004, Stevens received a performance evaluation completed by Morgan. The evaluation indicated that Stevens needed to improve her performance in five areas: (1) Core Values, defined as "[c]ommunicating and living by a set of non-negotiable core values; helping to define and apply the work group and organization's culture, value and ethics;" (2) Agreement, defined as "[b]uilding consensus, developing win-win solutions, resolving situational conflicts;" (3) Organizational Learning, defined as "[a]nticipating problems and trends, seeking continuous improvement, learning from mistakes;" (4) Vision, defined as "[u]nderstanding organizational vision and applying it to person vision, inspiring others;" and (5) Strategic Direction, defined as "[b]uying into corporate strategic initiatives, focusing on steps necessary to achieve strategy." Morgan believed that Stevens was not a good employee because, despite her sales goals, these were "very strong points [ ] that needed to be improved upon." Stevens does not claim that any other sales associate received more favorable treatment in his or her evaluation.

In July of 2004, Stevens had an incident with Heddy McCraw, a decorator for Del Webb. Specifically, while McCraw was adding flower arrangements to the lobby as Morgan had instructed her to do, Stevens asked McCraw "do we have to have big flower arrangements like that? Why can't we stick to the small flower arrangements?" Stevens had no authority over McCraw or the decor of the model. Sutcliffe testified that McCraw was so upset about the incident that she reported to her "almost in tears," claiming that "Stevens was abrupt and rude and asked why she was putting the foliage on the tables, and they don't need to be there." Stevens believes McCraw lied about the incident "because she was coached by management for purposes of this deposition and trial."

On July 7, 2004, an altercation occurred between Stevens and Kelly Dale, a member of the Design Center staff. Stevens claims she approached Dale because a client's calls had not been returned and that she asked Dale to contact the client so he would know "the design center [had] not forgotten him." Stevens claims that Dale agreed to call the client but failed to do so. According to the Design Center staff, Stevens initiated a verbal altercation with Dale in the presence of another coworker. Sutcliffe testified that she met with the Design Center staff first, and then she met with Stevens to "hear her

side of the story." Sutcliffe issued a verbal warning to Stevens for raising her voice and becoming demanding toward Dale. Sutcliffe told Stevens that she needed to apologize to Dale for having raised her voice, but according to Sutcliffe, Stevens refused to apologize to Dale at that time. Stevens testified that she did not recall whether she refused to apologize. Sutcliffe testified that she then talked to Morgan, who told her that Stevens had to apologize or be issued a written warning and be required to leave the premises. According to Sutcliffe, because Stevens refused to apologize, she issued a written warning to Stevens, which Stevens refused to sign until after speaking with Morgan. Stevens slammed her door behind Sutcliffe after she left.

After a heated discussion with Morgan, Stevens refused a direct order to leave the premises. Stevens signed the written warning after being informed that she would be terminated if she continued to refuse to sign it. Because Stevens refused to leave, Morgan realized that she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office and [she was] not to leave. [She was] not to talk to anyone."

The written warning placed Stevens on 30–day probation and stated that she "must be able to control [her] emotions when discussing problems within our work environment." Sutcliffe stated that Stevens could not "just spurt things out and hurt people's feelings and demand things from [her] co-workers. That is being very aggressive." The next week, Stevens apologized to Dale and Amato Ostas.

When asked whether Stevens ever met the terms of the written warning, Sutcliffe testified that "there were incidences after that occurred, several," and "there were other complaints that had preceded that warning." Sutcliffe also testified that Stevens did not meet the terms of the warning because of the issue with McCraw, which occurred during the same week as the written warning. It is unclear whether the incident with McCraw occurred before or after the written warning.

Following the July 7, 2004, incident, Stevens was out of the office on vacation for two weeks. When she returned from her vacation, Del Webb received three complaints from customers regarding Stevens. Stevens and Morgan also testified that Stevens received a fourth complaint, from the Mustachios, though it is unclear whether that complaint came before or after the written warning.

With regard to the fourth complaint, Morgan testified that she received a call from the Mustachios who were "very, very upset, threatening to sue because they had given [Stevens] a credit card number and told her they wanted to buy a waterfront lot." The Mustachios complained that Stevens never generated a contract to hold the lot they desired, resulting in the lot being sold to another party. As she had done with other associates, Morgan used this incident to coach Stevens on following procedures but did not formally discipline her. Stevens does not recall this discussion but stated that it is possible that it occurred.

On July 27, 2004, Cain received a complaint from Mr. Christianson, who informed Cain that he had provided Stevens with a credit card number to hold a particular lot. Stevens never completed the necessary paperwork and never provided Mr. Christianson with a contract, and ultimately, another customer purchased the lot. Stevens' partner, Kelly, called Mr. Christianson to inform him that the lot had been sold and offered him another lot. Mr. Christianson "didn't want anything to do with the different lot," and he was so upset that he threatened to sue Del Webb. Ste-

vens' failure to complete the necessary paperwork was a direct violation of Del Webb's employment "Guidelines & Rules for Sun City Hilton Head," which Stevens admitted she had been provided and understood.

Sutcliffe testified that on August 9, 2004, Mr. and Mrs. Steger came into the office and asked to speak with a manager. The Stegers reported that they had met with Stevens and asked her if they could look at a property. Stevens informed the Stegers that she was too busy to take them and that "they should not go over there without her because she would have to share her commission." The Stegers reported that Stevens directed them to visit a model park and that she would talk to them when they returned if she was not too busy then. When the Stegers returned, Stevens was not in the office, and Sutcliffe testified that Stevens never followed up with the Stegers. Stevens testified that she does not remember this specific incident, but that "if it happened, what I probably said was I am too busy to take you over there right now. If you don't mind would you like to go look at the models and when you come back I will be happy to take you over there. And you probably understand if I send you over there on your own I would have to share the commission."

Sutcliffe testified that on August 11, 2004, another customer complained about Stevens. On this occasion, Mr. and Mrs. Crabtree spoke to Dorothy Apgar and Dan Denney expressing their interest in Del Webb's River Bend property. The Crabtrees told Apgar and Denney that they previously had met with Stevens, who refused to show them a property. Stevens claimed that the Crabtrees may have been induced to fabricate this claim at the behest of Denney, who Stevens claims was trying to keep all of the commissions in the River Bend development, but Stevens admits that she has no evidence to substantiate this claim.

Morgan testified that it is not required to always notify an employee when a notice was put into his or her personnel file, but that she generally counseled sales associates about any complaints. Morgan testified that she counseled Stevens with respect to only one of the four complaints, and that she did not discuss the other three complaints with Stevens until her termination.

Sutcliffe testified that on August 11, 2004, Jody Hurley, a new sales associate, told her that Stevens made her feel unwelcome by telling her that nobody wanted her there. Allegedly, Stevens told her that the sales associates did not want her or other new associates around because it was "splitting up the pie," and "they could have handled it without the new salespeople."

On August 16, 2004, Stevens met with Morgan and Cain and reviewed the incidents in her file. After this meeting, Sutcliffe and Mandy Michaels, a human resources representative, informed Stevens that she was being terminated for aggressive behavior and for not being a team player. The specific instances identified during discovery as leading to Stevens' termination include: (1) being argumentative during weekly sales meetings; (2) acting demeaning toward other co-workers and engaging in heated discussions with co-workers and supervisors; (3) ignoring management instructions, including Stevens' initial refusal to apologize as directed by management and her refusal to leave the premises when instructed to do so; and (4) improper handling of customers.[1]

---

1. Because these reasons were identified during discovery, Plaintiff feels that they are not relevant in considering Defendant's motion for summary judgment.

Morgan testified that it was unusual for a sales associate to receive four documented complaints in such a short period of time. Jack Tuney testified that his experiences with Stevens "were all positive" and that "[s]he always handled [his] people very, very well and [he had] no complaints whatsoever, or [Stevens] wouldn't have been [his] backup." Tuney testified that Stevens "was very pleasant to me" and that he never observed Stevens treating anyone in a disrespectful manner. Melba Burns Windham testified that she enjoyed working with Stevens, and she thought Stevens was one aggressive salesperson and very good at sales. Carole Richardson felt that Stevens behaved in a pleasant manner toward other sales people. Veronica Cadman testified that she never observed Stevens being disrespectful or demeaning to anyone. Art Kelly stated that Stevens was well-liked and a team player, helpful to others, and treated others with respect.[2]

Sutcliffe testified that a "team player" interact[s] with his or her co-workers, helps, is pleasant, and is nonaggressive. Sutcliffe testified that Stevens was aggressive in a negative way because she was demeaning and demanding, and she was the only sales associate about whom co-workers complained about aggressiveness. Sutcliffe testified that male co-workers "sometimes" received complaints for being "bossy," and that they were "probably" written up for such behavior. Sutcliffe testified that Stevens did not meet the terms of her probation due to incidents that occurred before and during the probationary period. After being fired, Stevens "looked [Sutcliffe] straight in the eye and [ ] said I will sue your fat ass."

After her termination, Stevens wrote a letter to Greg Duriez, Southeast Area President for Pulte Home Corporation, disputing her termination. Pulte treated her letter with the utmost seriousness and sent a representative from the corporate office to conduct two days of interviews at Del Webb's Sun City development. After a thorough investigation of Stevens' claims, Duriez stated, "we [found] no reason to alter the prior decision made by the local team."

On January 3, 2005, Stevens filed a Charge of Discrimination with the South Carolina Human Affairs Commission, alleging discrimination on the basis of her sex and age. The Commission determined that there was insufficient evidence to support Stevens' claims.

On September 15, 2005, Stevens filed the present suit alleging that she was disciplined and ultimately terminated on the basis of her sex; she alleges that "she was disciplined and terminated for conduct condoned in male associates." Also, she believes that "[t]his is subtle sex discrimination.... It is the kind of discrimination that you just feel by innuendo and looks that you get in the hall and passing little comments that probably really don't in and of themselves mean anything."

## DISCUSSION

### I. Legal Standard For Summary Judgment

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to

---

**2.** Del Webb believes that these statements are irrelevant because it is well-established in the Fourth Circuit that the opinions of co-workers are irrelevant. In assessing a plaintiff's performance, only the opinions of the employer are relevant. *See, e.g., King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir.2003); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 444–45 (4th Cir.1998); *Hawkins v. PepsiCo., Inc.,* 203 F.3d 274, 280 (4th Cir.2000).

weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## II. The Magistrate Judge's R & R

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 269, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The court reviews *de novo* those portions of the R & R to which a specific objection is made, and the court may accept, reject, or modi-

fy, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to him with instructions. 28 U.S.C. § 636(b)(1)(C). After a thorough review of the entire record, the R & R, and Stevens' objections, the court finds that the Magistrate Judge fairly and accurately summarized the facts and applied the correct principles of law. Therefore, the court adopts the Magistrate Judge's R & R in full and incorporates it herein by specific reference.

## OBJECTIONS

On July 10, 2006, Plaintiff filed objections to the Magistrate Judge's R & R, wherein she asserts (1) that there is a genuine issue of material fact as to the reasons given for Stevens' termination; (2) that there is no evidence that Plaintiff failed to comply with the probationary terms; (3) that there is a genuine issue of material fact as to whether Defendant's stated reasons for termination were accurate; (4) that there is a genuine issue of material fact as to Defendant's alleged disparate treatment of female sales associates; and (5) that whether Plaintiff engaged in unacceptable behavior subsequent to her probation is a genuine issue in dispute that requires a trial. As the court explains below, Plaintiff's objections are wholly without merit, and it is more than clear to this court that Defendant Del Webb is entitled to summary judgment.

## I. The Reasons Given for Plaintiff's Termination

In Stevens' first objection, she asserts that a genuine issue of material fact exists regarding the reasons given for her termination. Specifically, Stevens asserts that the R & R fails to focus on the reasons given for Plaintiff's termination at the time of termination and focuses only

on the reasons uncovered during discovery.[3] With regard to the reasons given for termination at the time of termination, Sutcliffe and a human resources representative informed Plaintiff that she was being terminated for aggressive behavior and for not being a team player. The incidents identified during discovery as leading to Stevens' termination included: (1) being argumentative during weekly sales meetings; (2) acting demeaning and condescending to other employees, and engaging in heated discussion with co-workers and supervisors—including the situations involving co-workers McCraw, Hurley, and members of the Design Center staff and slamming the door of her office behind Sutcliffe; (3) ignoring management instructions, including Stevens initially refusing to apologize to Design Center staff as directed by management and refusing to leave the premises when instructed to do so; and (4) improper handling of customers.

According to the parties' joint factual brief, at the time of termination, Plaintiff met with Morgan and discussed *each of the incidents* documented in her personnel file. Thus, while the reasons for termination identified during discovery may be more specific than the more general reasons given to Plaintiff at the time of termi-

nation, it is simply infeasible that the more specific reasons uncovered during discovery somehow came as a shock to Plaintiff. Moreover, it is clear that the specific reasons, while perhaps disputed by Plaintiff, do not deviate from the general reasons, but rather, they provide further evidence in support of the general reasons. Stated differently, the specific reasons identified during discovery simply provide precise examples of how Plaintiff was "aggressive and not a team player." *See Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1377 (11th Cir.1996) (stating that specific examples given by employer for termination were not inconsistent with broad explanation set forth at time of termination). Ultimately, because Del Webb's stated reasons both at the time of termination and during discovery amply provide a non-discriminatory, non-pretextual basis for termination, Plaintiff's attempt to create a genuine issue of material fact where there is none must fail. Accordingly, the court finds Plaintiff's first objection without merit.[4]

## II. Evidence of Plaintiff's Failure to Comply with the Probationary Terms

In her second objection, Stevens asserts that there is no evidence that she

3. On page 26 of the R & R, the Magistrate Judge states:
 Defendant agrees that Stevens was, in part, "ultimately fired for being aggressive and not being a team player." More specifically, as Defendant argues, based upon the Undisputed Facts, Stevens was terminated for being argumentative during weekly sales meetings; acting demeaning and condescending to other employees; engaging in heated discussions with co-workers and supervisors; ignoring management instructions; and improperly handling customers. (R & R at 26.)

4. In this objection, Plaintiff also claims: "The report states that Morgan testified that she

did not always counsel sales associates when they received complaints. This is in error as Morgan testified that she would normally discuss complaints with sales associates." What Plaintiff fails to recognize is that just because someone "normally" does something does not mean that someone "always" does something. Moreover, according to the parties' joint factual brief, "Morgan testified that, although *it is not required to always notify the employee* that you have put a notice in [his or her] personnel file, when sales associates receive complaints, they are *generally* counseled regarding the matter." (Jt. Fact. Br. at 17.) (emphasis added).

failed to comply with the probationary terms.[5] The court finds this objection to be no more than a red herring, in that Plaintiff cunningly attempts to tie her termination directly to, and only to, her failure to comply with probationary terms. In other words, Plaintiff seems to be under the false impression that she could not be fired for any reason other than violating the written requirements of her probation. However, it is clear that Del Webb expected Plaintiff to live up to the job description she signed on her first day of employment, and it is clear that management found her job performance to be lacking in many respects. Thus, the fact that Stevens' incident with McCraw may have occurred before her probation, and/or the fact that Plaintiff disputes at least three of the customer complaints, does not diminish the importance of these incidents. Regardless, while a failure to comply with probationary terms may or may not have factored into Del Webb's decision to terminate Plaintiff, the record reflects that Del Webb's decision to terminate Plaintiff for being "aggressive and not a team player" was well within its province and clearly encompassed more than a failure to comply with probationary terms. Accordingly, the court finds Plaintiff's second objection without merit.

## III. The Accuracy of Defendant's Stated Reasons for Termination

 Stevens asserts that the R & R failed to consider the opinions of Stevens' co-workers. However, on page 26 of the R & R, the Magistrate Judge states:

With respect to defining a "team player," Sutcliffe said a team player interacts with co-workers, helps others, [is] pleasant, and [is] nonaggressive. Tuney said Stevens was very pleasant to him

and he never observed Stevens treating anyone in a disrespectful manner. Richardson believed Stevens behaved in a pleasant manner toward other sales people. Cadman thought Stevens was well-liked, willing to help[,] and [she] never observed Stevens being disrespectful or acting in a demeaning manner to anyone. Art Kelly, Stevens' partner, said she was well-liked and a team player, helpful to others[,] and treated others with respect.

Defendant contends that the facts demonstrate that Plaintiff was not a "team player" because she did not interact well with her co-workers, she was unpleasant, and she was aggressive, as reflected by various conflicts involving co-workers, supervisors, and customers. Defendant argues that the fact that some of Plaintiff's co-workers testified that she was a "team player" is irrelevant. Indeed, it is well settled in the Fourth Circuit that the opinions of co-workers are irrelevant in assessing a plaintiff's performance. Only the opinions of the employers are relevant. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444–45 (4th Cir. 1998); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir.2000). (R & R at 26–27.) Nevertheless, Plaintiff contends that the facts in *Rumsfeld* are distinguishable from the present case because the co-workers were assessing Rumsfeld's *performance*, whereas in the present case, Plaintiff's co-workers offered opinions on her interaction with them and whether she was a team player. The court finds this to be a distinction without a difference, as it is clear that Plaintiff's interaction with her co-workers is necessarily part and parcel of her job perform-

---

**5.** Plaintiff's written warning stated that she "must be able to control [her] emotions when

discussing problems within our work environment."

ance. In fact, Plaintiff's job description required her "to communicate properly to the appropriate departments any customer request for information or services" and "to work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission." As the Magistrate Judge pointed out, it is clear in the Fourth Circuit that "[i]t is the perception of the decision maker which is relevant ...., not the opinions of [ ] co-workers or other third parties." *See Tinsley*, 155 F.3d at 444. Thus, the fact that a selected group of Stevens' co-workers believed that Stevens was a team player does not replace Del Webb management's reasonable determination that she was not. Nor do the selected group of co-workers' opinions generate a genuine issue of material fact, especially in light of the undisputed facts supporting Del Webb's determination. Moreover, as Defendant points out, Plaintiff's assertion that "[w]ithout exception, the co-workers testified that Stevens treated them well and was a team player" is not entirely true, as it overlooks the complaints made by Plaintiff's supervisors, other Del Webb employees, and customers. In light of the aforementioned, the court finds Plaintiff's third objection that the R & R failed to consider the opinions of her co-workers without merit.

## IV. Defendant's Alleged Disparate Treatment of Female Sales Associates

In her fourth objection, Stevens asserts that there is a genuine issue of material fact as to Del Webb's alleged disparate treatment of female associates. In support of her assertion, Stevens states that the R & R failed to consider the testimony of Donna MacDonald, who testified that Morgan treated male sales associates more favorably than females.[6] Plaintiff asserts that "[t]he Report fails to take into consideration that the other witnesses are all either current employees dependant upon Defendant for their jobs, or in related businesses which also depend upon defendant's goodwill."[7] (Obj. at 3.) Plaintiff's reliance on MacDonald's testimony to create a genuine issue of material fact is misplaced for several reasons.

First, as the Magistrate Judge points out in footnote 44, MacDonald's employment predated Stevens' employment. Second, none of MacDonald's assertions relate in any way to Plaintiff. Rather, MacDonald asserts that she observed an incident of alleged disparate treatment involving another employee, Veronica Cadman. However, Cadman herself testified:

> Q. Do you think based on your experience that management, Glenda [Morgan], Joanne [Sutcliffe] when

**6.** In its reply to Plaintiff's response in opposition to the motion for summary judgment, Defendant asserts that MacDonald's declaration makes a host of false allegations, and not one relates to Plaintiff. For instance, Defendant asserts that MacDonald's claims that she was fired while on leave and was wrongfully denied leave under the Family and Medical Leave Act are both false because MacDonald was permitted a leave of absence but never returned to work. Moreover, she was not eligible for leave under the FMLA because she had not been employed by Del Webb for the requisite 12–month period at the start of her leave. Defendant points out that Mac-

Donald's assertion that no male associates were disciplined is likewise false because the record demonstrates that male associates were, in fact, both disciplined and discharged.

**7.** The court finds this statement particularly interesting given that Plaintiff objects to the Magistrate Judge making an improper credibility determination, and then she seems to turn around and ask this court to do that to which she just objected by insinuating that all of the witnesses who are current employees of Defendant or who depend upon Defendant's goodwill must be lying.

she was there, Elizabth [Cain] showed favoritism toward men sales associates?

A. No, because I have seen them get in—reprimanded too if they have done something that management feels is inappropriate.

Q. So you feel there is equal treatment—

A. Yeah.

Q. —between the men and the women?

A. Between the men and the women, yes.

(Cadman Depo. at 25:6–17.) In any event, as the Magistrate Judge properly concluded, "MacDonald's statement, standing alone, does not raise a genuine issue of material fact, given the testimony of other witnesses," and especially in light of the fact that none of MacDonald's assertions in any way relate to Plaintiff's termination. (R & R at 30.)

 Moreover, Plaintiff's fundamental misunderstanding of the meaning of "aggressive" in the context of her termination does not raise a genuine issue of material fact.[8] In her objections, Plaintiff complains that "Morgan and Sutcliffe both testified as to aggressiveness being a good thing in a sales associate," and that "she was fired for a reason (aggressiveness and not being a team player) that is suspect. . . ." (Obj. at 4.) Plaintiff continues: "The magistrate . . . states that 'the court has determined that there were many dif-ferences in the 'aggressive' behavior of Price (a male sales associate) and Plaintiff.' The court does not instruct further as to what these differences were." (Obj. at 4.) However, quite the contrary to Plaintiff's assertion, the Magistrate Judge provides a great deal of instruction as to those differences. For example, the R & R provides:

Plaintiff claims that Greg Price "blew up in [the] contracts [Department] one time screaming and yelling at everybody back there, and he got no performance—written warning to my knowledge and he certainly wasn't fired." Defendant admits that Price was involved in an incident in the Contracts Department; Price immediately was verbally reprimanded for his conduct, and Morgan's reprimand was so direct that Price feared he would be fired over the incident. Morgan testified that when she told Price he needed to apologize he said, "you are exactly right. I do." According to Morgan, Price "went right down and apologized" and Morgan believes Price "even bought them lunch the next day as an apology."

Although Plaintiff likewise had "vented" at the Design Center staff on July 7, 2004 because that staff had not contacted Plaintiff's client, it does not appear that Plaintiff and Price were "similarly situated" because Plaintiff and Price responded differently to their supervisors' criticisms of their conduct. With respect to Plaintiff, . . . Sutcliffe told Plaintiff to apologize to Kelly Dale for

---

8. As Defendant asserts in its reply to Plaintiff's memorandum in opposition to summary judgment:

Plaintiff notes that Morgan made clear that she was referring to "aggressive" only in the context of a sales associate position being "consistent, persistent, and aggressive" with respect to selling properties. Throughout her Response, Plaintiff attempts to alter the meaning of the word "aggressive" as used by Del Webb management—inclined to behave in an actively hostile fashion—to an alternative definition of the same word—assertive, bold, and energetic. Clearly the same word, in different contexts, may have a positive or negative meaning in an employment setting. It is beyond question that Del Webb did not discipline Plaintiff for being "assertive, bold, and energetic," but rather because she behaved in an "actively hostile fashion."

(Reply at 6–7.)

having raised her voice, but according to Sutcliffe, Plaintiff refused to apologize at that time. Plaintiff testified that she had no recollection as to whether or not she refused to apologize at that time. Sutcliffe testified that she then spoke with Morgan, who told Sutcliffe that Stevens had to apologize or be issued a written warning and be required to leave the premises. Sutcliffe testified that, because Stevens refused a direct order ..., Sutcliffe issued a written warning for Plaintiff, which Plaintiff still refused to sign until after speaking with Morgan. Plaintiff admits that when Sutcliffe left, Plaintiff slammed the door behind her. After a heated discussion with Morgan, Stevens refused a direct order to leave the premises. Stevens signed the written warning after being informed by Morgan that she would be terminated if she continued to refuse to do so. Because Stevens refused to leave, Morgan realized that she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office and [she was] not to leave. [She was] not to talk to anyone.

In contrast, after Price was reprimanded by Morgan, he did not respond by raising his voice to her; he did not slam the door behind her; and he did not refuse a direct order by her. Thus, Price's conduct did not come close to the seriousness of that of Plaintiff's conduct. Unlike Plaintiff, Price apologized immediately to the persons he yelled at, and subsequently bought lunch for the entire Contracts Department staff. Furthermore, there is no evidence that Price had any other disciplinary problems of any kind. There are significant differences between Plaintiff's conduct and Price's conduct, and therefore the court concludes that Price is not a similarly situated male.

(R & R at 17–19.) Likewise, because Plaintiff engaged in misconduct of greater seriousness than Price, the Magistrate Judge determined that Plaintiff could not show that any male sales associate was given more favorable treatment than her. Ultimately, in light of the aforementioned, the court finds that Plaintiff's fourth objection fails, as there is no genuine issue of material fact regarding Del Webb's alleged disparate treatment of female associates, and Plaintiff's remaining claims amount to no more than inaccurate generalizations.

### V. Whether Stevens Engaged in Unacceptable Behavior Following Probation

In her final objection, Plaintiff asserts that whether she engaged in unacceptable behavior following her probation is a genuine issue in dispute that requires a trial. However, the court finds Plaintiff's assertion incorrect because, as discussed in relation to Plaintiff's second objection, this assertion is no more than a red herring. The record reflects that management made the decision to terminate Plaintiff for being "aggressive and not a team player," as evidenced by Plaintiff's: argumentative behavior during sales meetings; her interactions with co-workers and supervisors; her failure to follow management instructions; and her improper handling of customers. The evidence of record, including those facts agreed to by the parties in their joint factual brief, provides ample non-discriminatory, non-pretextual reasons in support of Del Webb's decision to terminate Plaintiff. Thus, the court finds no genuine issue of material fact with respect to whether Plaintiff engaged in unacceptable behavior following her probations. "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." And no court

sits to arbitrate mere differences of opinion between employees and their supervisors. *Hawkins,* 203 F.3d at 281 (internal citations omitted); *see also Goldberg v. B. Green & Co., Inc.,* 836 F.2d 845, 848 (4th Cir.1988) (stating that Plaintiff's own opinions and conclusory allegations do not have sufficient "probative force to reflect a genuine issue of material fact").

### CONCLUSION

It is, therefore, **ORDERED,** for the foregoing reasons that Defendant's motion for summary Judgment is **GRANTED.**

**AND IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

KOSKO, United States Magistrate Judge.

### I. INTRODUCTION

The Plaintiff, Susan K. Stevens ("Plaintiff" or "Stevens"), a Caucasian female, brought this action against the Defendant, Pulte Homes of South Carolina, Inc., d/b/a Del Webb Communities, Inc., claiming that she was terminated from employment as a sales associate at Del Webb Communities, Inc. (the "Defendant") because of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2000e–17 ("Title VII").[1]

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(g), D.S.C., the undersigned Magistrate Judge is authorized to review all pretrial matters in cases filed under 42 U.S.C. § 2000e, *et seq.,* and submit findings and recommendations to the District Court.

### II. UNDISPUTED FACTS

Pursuant to the Joint Factual Brief filed by the Plaintiff and Defendant [23–1], the parties have agreed upon certain facts, which are set forth below:

Stevens was interviewed and hired by Glenda Morgan, Vice President of Sales for Defendant. Stevens began her employment on January 6, 2003 as a Sales Associate. Stevens' employment with Defendant was at-will. During Stevens' tenure with Defendant, all three of her supervisors (Glenda Morgan, Elizabeth Cain, and Joanne Sutcliffe) were female.

The Defendant maintains an Equal Employment Policy which is designed to ensure that no employee or applicant is subject to discrimination of any kind. Stevens was in receipt this policy. Prior to her termination, Stevens never made any complaint of discrimination. On her first day of employment, Stevens was provided a job description for the sales associate position, which Stevens signed, certifying that she had read said description and was able to perform the duties contained therein. Among these duties, Stevens understood that she was required to "communicate properly to the appropriate departments any customer request for information or services," as well as to "work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission." Stevens believed a company has the right to expect employees to treat customers and co-workers with respect.

As a sales associate, Stevens was responsible for showing and selling single-family homes, condos and lots in Defendant's Sun City development. Sometime during the first year of Stevens' employment with Defendant, she and Art Kelly

---

**1.** *See* Complaint [1–1] at p. 4, ¶ 24.

became partners. Kelly and Stevens shared all commissions and split the seven day work week so that one of them was in the office every day. Stevens and Kelly were among top in sales for their category.

During Stevens' employment, weekly sales meetings were conducted, at which management provided the sales staff with information regarding pricing, lot releases, home standards and other business concerns. Morgan preferred that sales associates, regardless of their sex, did not raise issues in a sales meeting, because one of the reasons for sales meetings was to inspire the sales associates to prepare them to make sales. Stevens believed that during these meetings, management, particularly Morgan, "never cared to have any input from the sales people ... Very unopen to any kind of new ideas, therefore if you broached a new subject with them they would try to put you in your place, so to speak." Stevens claims that even when male sales associates brought up issues, management "might not always be nice about it, but sometimes they would say well, see me about that later ..." Stevens believed that Jack Tuney could verify that "[Morgan] was never one to solicit opinions from salespeople and that when they did they would get shut down." Stevens testified that Tuney had "learned to not say anything [in a sales meeting] because he was afraid of [Morgan] as well." Tuney testified that "[Stevens] and I would both speak very openly in meetings, the morning meetings. I learned to stop. She never did."

Early on in her employment, Stevens was counseled following a sales meeting in which she openly and admittedly challenged management's pricing decisions. One of Stevens' sales managers, Elizabeth Cain, verbally warned her that the Company "would not tolerate salespeople being disruptive, that it was none of [her] business how [properties were] priced, and if [she] was disruptive like that in the future she could be asked to leave."

Stevens informed management that "in California we wouldn't dream of building a house without a smooth ceiling because you could never sell it." Stevens testified that she "would throw [this criticism] in a lot," so much so that it became a "joke" within the office and her co-workers began to refer to smooth ceilings as "California Susan ceilings." Ross Turpin testified that "[i]t seemed like in a majority of the sales meetings, [Stevens] would raise the issue of popcorn ceilings. She would not let it drop." Reid McCall testified that "Stevens repeatedly brought up the issue of popcorn ceilings during sales meetings." Greg Price testified that, "[w]hile other sales associates may also be outspoken, the difference was that [Stevens] was not outspoken in a diplomatic way. For example, when bringing up popcorn ceilings, she would say 'my customers do not like them' and 'that is not how they do it in California' in a tone of voice that was not diplomatic."

Stevens expressed her belief that Defendant's Sun City development was "20 years behind the times." Stevens explained that Morgan did not understand that the property she managed was behind the times because "she [was] not from the west where the west is more progressive in home building. California typically sets the standard for the rest of the country in home building contracts and everything else." [2] One of Stevens' co-workers stated that "if a manager disagreed with her, she

---

**2.** Plaintiff expressed this belief to Defendant's counsel during deposition, not during her employment with Defendant.

would say that out in California, we did it this way."

Reid McCall testified that "Stevens could come across very mean during sales meetings." Carole Richardson testified that she "truly remember[ed] [Stevens] as being challenging in sales meetings." Stevens' managers believed that she disrupted sales meetings by engaging in distracting conversation with co-workers. On one occasion, Stevens had disrupted a meeting by talking with a co-worker. In the following meeting, Morgan asked Stevens to sit in front with her so that she would not talk during the meeting. Ross Turpin stated that while he believed Morgan's manner of separating Stevens to prevent her from disrupting sales meetings was "totally unprofessional, this may have been a knee jerk reaction to [Stevens'] constant badgering. A couple of times, [Turpin] was afraid [Stevens] might be asked to leave the meeting."

Melba Burns Windham thought being separated was humiliating for Stevens. While Windham felt that Morgan "relates better to men than she does with women," she believed that "we all relate to a particular gender better than we do the other," and that it is "not necessarily a negative or a positive." Windham also testified that Morgan was a good manager and that she did not "think [Morgan] is capable of deliberately discriminating because of sex, race, or anything like that." Stevens testified she was not humiliated by being separated for talking in a sales meeting because she was "pretty thick skinned." During the sales meetings she attended, Stevens does not recall male sales associates being asked to move to the front of the room. Morgan recalls asking male sales associate Mike Martin to move to the front of the room in order to prevent him from disrupting sales meetings by talking. Veronica Cadman recalls Morgan asking male sales associate Rick Malone to move to the front of the room during a sales meeting. According to Plaintiff, on other occasions, Morgan sat between male sales associates in order to prevent them from talking during sales meetings.

On March 31, 2004, Stevens received a performance evaluation completed by Morgan. The evaluation indicated management's belief that Stevens needed to improve her performance in five areas:

- Core Values—defined as "Communicating and living by a set of non-negotiable core values; helping to define and apply the work group and organization's culture, values and ethics";

- Agreement—defined as "Building consensus, developing win-win solutions, resolving situational conflicts";

- Organizational Learning—defined as "Anticipating problems and trends, seeking continuous improvement, learning from mistakes";

- Vision—defined as "Understanding organizational vision and applying it to person vision, inspiring others"; and

- Strategic Direction—defined as "Buying into corporate strategic initiatives, focusing on steps necessary to achieve strategy."

Morgan believed that Stevens was not a good employee because, despite meeting her sales goals, her evaluation revealed "very strong points [ ] that needed to be improved upon." Stevens also completed a self-evaluation in which she rated herself as needing improvement in "Vision." [3]

---

**3.** Stevens does not claim any other sales associate received more favorable treatment in his or her evaluation.

In July 2004, Stevens was involved in a situation with Heddy McCraw, a decorator for Defendant's model homes. McCraw was adding flower arrangements to the lobby area, as Morgan had instructed her. Stevens testified that she asked McCraw "do we have to have big flower arrangements like that? Why can't we stick with the small flower arrangements?" Stevens had no authority over McCraw or the décor of the model. Sutcliffe testified that McCraw was so upset about the incident that she reported to her, "almost in tears," that Stevens "was abrupt and rude and asked why she was putting the foliage on the tables, and they didn't need to be there." Stevens believes that McCraw lied about the incident "because she was coached by management for purposes of this deposition and trial."

On July 7, 2004, Stevens was involved in an altercation with members of the Design Center staff. Stevens claims that she approached Kelly Dale because a client's calls were not being returned. Stevens asked Dale to contact the client so that he would know "the design center [had] not forgotten him." Stevens claims that Dale agreed to contact the client, but failed to do so. The Design Center staff claim that Stevens initiated a verbal altercation with Dale in the presence of another co-worker. Sutcliffe testified that after meeting with the Design Center staff, Sutcliffe met with Stevens to "hear her side of the story." After doing so, Sutcliffe issued a verbal warning to Stevens for raising her voice and becoming demanding toward Dale. Sutcliffe told Stevens that she needed to apologize to Dale for having raised her voice. Sutcliffe testified that Stevens refused to apologize at that time. Stevens testified she had no recollection as to whether or not she refused to apologize at that time. Sutcliffe testified that she then spoke with Morgan. Morgan told Sutcliffe that Stevens had to apologize or be issued

a written warning and be required to leave the premises. Sutcliffe testified that, because Stevens refused a direct order to go home, on Morgan's instruction, Sutcliffe issued a written warning for Stevens, which she refused to sign until after speaking with Morgan. When Sutcliffe left, Stevens slammed the door behind her. After a heated discussion with Morgan, Stevens refused a direct order to leave the premises. Stevens signed the written warning after being informed by Morgan that she would be terminated if she continued to refuse to do so. Because Stevens refused to leave, Morgan realized she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office and [she was] not to leave. [She was] not to talk to anyone." Stevens' written warning placed her on thirty-day probation and stated that she "must be able to control [her] emotions when discussing problems within our work environment." Sutcliffe stated that Stevens could not "just spurt out things and hurt people's feelings and demands things from [her] co-workers. That is being very aggressive." Although Sutcliffe testified that Stevens refused the orders of Sutcliffe and Morgan to apologize to the Design Center staff for her actions, and Stevens has no recollection of whether or not she refused the order, the following week Stevens apologized to Kelly Dale and Lisa Amato Ostas. Asked if Stevens ever met the terms of the written warning, Sutcliffe stated "there were incidences after that that occurred, several" and Stevens did not meet the terms, and "there were other complaints that had preceded that warning." Sutcliffe also testified that Stevens did not meet the terms of the warning because of the issue with Heddy McCraw, which occurred during the same week as Stevens' warning. It is unclear whether the inci-

dent with Heddy McCraw occurred before or after Stevens was issued the warning.

Following the July 7, 2004, incident, Stevens was out of the office for two weeks on vacation. After Stevens returned from her vacation, Defendant received three complaints from customers regarding Stevens. Stevens and Morgan also testified that Stevens received a fourth complaint, from a Mr. and Mrs. Mustachio, though it is unclear whether that complaint was received before or after Stevens was issued the warning. Morgan testified that she received a call from the Mustachios, who were "very, very upset, threatening to sue [Defendant] because they had given [Stevens] a credit card number and told her they wanted to buy a waterfront lot." The Mustachios complained that Stevens never generated a contract to hold the lot they desired, resulting in the lot being sold to another party. Stevens does not recall this customer. As she had done with other associates, Morgan testified that she used the incident as an opportunity to coach Stevens on following procedures, but did not formally discipline Stevens. Stevens does not recall this discussion, but stated it is possible that it occurred.

On July 27, 2004, Elizabeth Cain received a complaint from a Mr. Christianson, who had informed Stevens that he wanted to purchase a particular lot. In order to have the lot held, Christianson provided Stevens with his credit card information. However, Stevens never completed the paperwork necessary to hold the lot, and never provided Christianson with a contract to purchase the lot. Due to Stevens' failure to complete the paperwork, another customer purchased the lot. Stevens' partner, Art Kelly, called Christianson to inform him that the lot had been sold and to offer him another lot. Christianson "didn't want anything to do with the different lot." Christianson was so upset he threatened to bring suit against Defendant over the incident. Stevens' failure to complete the necessary paperwork was a direct violation of Defendant's employment "Guidelines & Rules for Sun City Hilton Head," which Stevens admitted to being provided with and understanding.

Sutcliffe testified that, on August 9, 2004, a Mr. and Mrs. Steger came into the office and asked to speak with a manager. The Stegers reported to Sutcliffe that they had previously met with Stevens. Sutcliffe testified that the Stegers reported that when they asked Stevens if they could look at a particular property, Stevens informed them that she was too busy to take them and that "they should not go over there without her because she would have to share her commission." Sutcliffe testified that the Stegers reported that Stevens directed them to visit the model park and, if she was not too busy when they returned, that she would talk to them then. Sutcliffe testified that when the Stegers returned, Stevens was not in. Sutcliffe testified that Stevens never followed up with the Stegers. Stevens testified that she does not recall this specific incident involving the Stegers, but testified that "if it happened, what I said probably was I am too busy to take you over there right now. If you don't mind would you like to go look at the models and when you come back I will be happy to take you over there. And you probably understand if I send you over there on your own I would have to share the commission."

Sutcliffe testified that on August 11, 2004, another customer complained about Stevens. On this occasion, a Mr. and Mrs. Crabtree spoke to Dorothy Apgar and Dan Denney expressing their interest in Defendant's River Bend property. The Crabtrees told Apgar and Denney that they had previously met with Stevens, who refused to show them a property. Stevens claims

that the Crabtrees may have been induced to fabricate this complaint at the behest of Denney, who Stevens claims was trying to keep all of the commissions in the River Bend development, but admits to having no facts to substantiate this claim.

Morgan testified that although it is not required to always notify the employee that you have put a notice in their personnel file, when sales associates receive complaints, they are generally counseled regarding the matter. Morgan testified that she counseled Stevens with respect to only one of the four complaints. The other three complaints were not discussed with Plaintiff until her termination.

Sutcliffe testified that on August 11, 2004, Jody Hurley, a newer sales associate, informed Sutcliffe that Stevens had earlier made her feel unwelcome by stating that nobody wanted her there. After Hurley had been at working for less than two weeks, Stevens told her that the salespeople did not want Hurley or other new associates to have been hired because it was "splitting up the pie," and they "could have handled it without the new salespeople."

Stevens was terminated on August 16, 2004. After meeting with Morgan and Cain and reviewing the incidents documented in Stevens' file, Sutcliffe and Mandy Michaels, Human Resources Representative for Defendant, informed Stevens she was being terminated for aggressive behavior and not being a team player. The specific instances identified during discovery as leading to Stevens' termination included:

- Being argumentative during weekly sales meetings;

- Acting demeaning and condescending to other employees, and engaging in heated discussions with co-workers and supervisors. This included the situations involving co-workers McCraw, Hurley, and members of the Design Center staff, and slamming the door of her office behind Sutcliffe.

- Ignoring management instructions, including Stevens initially refusing to apologize to the Design Center staff as directed by management, and refusing to leave the premises when instructed to do so.

- Improper handling of customers.[4]

Morgan testified that it was unusual for a sales associate to receive four documented complaints in such a short duration of time. Art Kelly stated that Stevens was well liked and a team player, helpful to others and treated others with respect.[5] Some of Stevens' former co-workers stated that, in their experience, Stevens was a team player and was liked by her co-workers. Sutcliffe testified that a "team player" "interact[s] with their co-workers, they help each other, they are pleasant, they are nonaggressive." Sutcliffe testified that Stevens was aggressive in a negative way in that she was demeaning and demanding, and that she was the only sales associate about whom Sutcliffe received complaints from her co-workers regarding her aggressiveness. Sutcliffe testified that male co-workers "sometimes" received complaints from co-workers for being "bossy," and that they were "probably" written up for such behavior. In addition to discussing each offending incident with Stevens, Sutcliffe testified that Stevens did not meet the terms of her probation due to incidents that occurred

---

4. As they were identified during deposition, Plaintiff feels these reasons are not relevant for consideration of the summary judgment motion.

5. Defendant believes these statements are irrelevant.

before and during the probationary period. After being told she was being terminated, Stevens "looked [Sutcliffe] straight in the eye and [ ] said I will sue your fat ass."

After her termination, Stevens wrote a letter to Greg Duriez, Southeast Area President for Pulte Home Corporation, disputing her termination. Pulte Home treated Stevens' letter with the utmost seriousness, sending a representative from the corporate office in Atlanta, Georgia to conduct two days of interviews at Defendant's Sun City development to investigate Stevens' claims. Stevens believes the Company was earnestly attempting to investigate her claims. After thorough investigation of Stevens' claims, Duriez stated "we [found] no reason to alter the prior decision made by the local team."

On January 3, 2005, Stevens filed a Charge of Discrimination with the South Carolina Human Affairs Commission ("SHAC"), alleging discrimination on the basis of her sex and age. After duly investigating Stevens' allegations, SHAC determined there was insufficient evidence to support Stevens' claims of unlawful discrimination. On September 15, 2005, Stevens filed the present action, alleging she was disciplined and ultimately terminated on the basis of her sex, in violation of Title VII. Stevens alleges that "she was disciplined and terminated for conduct that is condoned in male associates."[6] Stevens believes "[t]his is subtle sex discrimination ... It is the kind of discrimination that you feel just by innuendo and looks that you get in the hall and passing little comments that probably really don't in and of themselves mean anything."[7]

### III. PROCEDURAL HISTORY

On September 15, 2005, Stevens filed her complaint and the Defendant filed its answer on October 7, 2005. Discovery was commenced by the parties; thereafter, on April 10, 2006, the Defendant filed a Motion and Memorandum in support of Summary Judgment. [15–1—15–19]

On April 28, 2006, Stevens filed a Response to the Defendant's Motion for Summary Judgment, with supporting documents. [16–1—16–10] The Defendant filed a reply on May 8, 2006. [20–1] Thereafter, at the request of the undersigned, the parties filed their Joint Factual Brief. [23–1] Accordingly, this matter is ripe for disposition on Defendant's Motion for Summary Judgment.

### IV. SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The court is not to weigh the evidence but rather to determine if there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the non-moving party. See Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123–24 (4th Cir.1990).

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). This does not mean that summary judgment is never appropriate in employment discrimination cases. To the contrary, "the mere existence of

---

6. Plaintiff's Comp. ¶ 23.

7. Plaintiff's Dep. 194:8–19.

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id., quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

The court must view the facts in the light most favorable to the non-moving party, drawing all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505; *Love–Lane v. Martin,* 355 F.3d 766, 775 (4th Cir.2004). "The plaintiff, to survive the defendant's motion, need only present evidence from which a jury might return a verdict in [her] favor. If [she] does so, there is a genuine issue of fact that requires a trial." *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. Nevertheless, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong

when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole,* 48 F.3d 1376, 1381 (4th Cir.1995), *quoting Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548; *Smith v. City of North Charleston,* 401 F.Supp.2d 530, 532–33 (D.S.C.2005).

## V. ANALYSIS OF PLAINTIFF'S CLAIMS

### A. The Relevant Time Period

First, the court will establish the parameters of time with respect to the alleged discriminatory events. Any claims pertaining to events that occurred more than 300 days prior to the filing of Plaintiff's Charge of Discrimination with the EEOC on January 5, 2005 are outside the statutory period of limitations for Title VII claims.[8] *See* 42 U.S.C. § 2000e–5(e)(1); *Hamilton v. 1st Source Bank,* 928 F.2d 86, 88 (4th Cir.1990) *(en banc).* Accordingly, any claims regarding events that occurred during those sales meetings prior to March 31, 2004 are not within the scope of Plaintiff's Title VII action. As mentioned above, Plaintiff attended only one sales meeting after March 31, 2004, (on April 29, 2004), and she does not allege that any discriminatory act occurred during the April 29, 2004 meeting.

### B. Introduction

Plaintiff alleges wrongful termination based upon her gender and that "she was disciplined and terminated for conduct that is condoned in male associates."[9] Plaintiff

---

**8.** Even assuming, *arguendo,* that any event related to the sales meeting were timely, being asked to sit up front in one sales meeting cannot constitute an adverse employment action. *Matvia v. Bald Head Island Management, Inc.,* 259 F.3d 261 (4th Cir.2001); *Munday v. Waste Management of North America, Inc.,* 126 F.3d 239 (4th Cir.1997).

**9.** Pl.'s Complaint [1–1] at ¶ 23.

can satisfy her burden of proof by direct proof of discriminatory intent (*Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)), or through the indirect, burden shifting method of proof set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *and St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

### C. Factual Disputes Between the Parties.

Plaintiff specifically alleges that "she was disciplined and terminated for conduct that is condoned in male associates."[10] The Plaintiff and Defendant have identified the following facts in dispute:

### 1. Whether Plaintiff was disciplined more harshly than male sales associates.

Plaintiff and Defendant agree[11] that in order to establish a *prima facie* case of discrimination in the enforcement of employee disciplinary measures under Title VII, Plaintiff must show: (1) that she is a member of the class protected by Title VII; (2) that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against her were more severe than those enforced against those other employees. *See e.g., Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511–512 (4th Cir.1993); *Moore v. City of*

*Charlotte, NC*, 754 F.2d 1100, 1105–1106 (4th Cir.1985).

First, it is not disputed that Plaintiff, as a female, is a member of a class protected by Title VII. Next, Second, Plaintiff must show that the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class. As part of satisfying the second prong of the *Cook* test, the Plaintiff must demonstrate that the actions of "similarly situated" persons are "comparable in seriousness" so that an adverse employment action against a plaintiff logically can be compared to more lenient (disparate) treatment of others. *See e.g., Cook*, 988 F.2d at 511; *Moore*, 754 F.2d at 1105–1106; *Johnson v. Burnley*, 887 F.2d 471 (4th Cir.1989).

In her deposition, Plaintiff identified three "similarly situated" individuals, all of whom were male, but were not disciplined as severely as she was. These three males were (1) an unnamed male sales associate, (2) Greg Price; and (3) Nick Barnum.[12] Plaintiff testified that the unnamed male sales associate missed a number of work days due to his alcoholism, but "it took [Defendant] a long time to get around to firing him, though."[13] Stevens alleges that this constitutes "deferential treatment" because "if any women hadn't shown up for work for days on end the way he didn't they would have been fired way sooner than he was."[14] Morgan testified that the unnamed sales associate suffered from substance abuse problems and was enrolled in the Company's Employee Assistance Program ("EAP"), which Defendant offers to aid employees with sub-

---

10. Pl.'s Complaint [1–1] at ¶ 23.

11. *See* Plaintiff's Brief [16–2] at 12; Defendant's Brief [15–2] at 16.

12. Plaintiff. Dep. 153:19–24, 170:14–18, 238:11–18.

13. Plaintiff. Dep. 169:25–170:18.

14. Plaintiff. Dep. 170:14–18.

stance abuse problems. The particular facts regard this employee, however, suggest that he is not "similarly situated" to Plaintiff because the unnamed male sales associate apparently suffered from substance abuse problems which were thought to have been associated with a medical condition, and the male employee was enrolled in the Company's EAP for treatment. Ultimately, the unnamed male sales associate was terminated for failing to conform to the terms and conditions of the EAP and the guidelines placed on his continued employment. Thus, it does not appear to the court that this male sales associate was similarly situated to Plaintiff.

Next, Plaintiff claims that Greg Price "blew up in [the] contracts [Department] one time screaming and yelling at everybody back there, and he got no performance—written warning to my knowledge and he certainly wasn't fired." [15] Defendant admits that Price was involved in an incident in the Contracts Department; Price immediately was verbally reprimanded for his conduct, and Morgan's reprimand was so direct that Price feared he would be fired over the incident. [16] Morgan testified that when she told Price he need to apologize he said "you are exactly right. I do." According to Morgan, Price "went right down and apologized" and Morgan believes Price "even bought them lunch the next day as an additional apology."

Although Plaintiff likewise had "vented" at the Design Center staff on July 7, 2004 because that staff had not contacted Plaintiff's client, [17] it does not appear that Plaintiff and Price were "similarly situated" because Plaintiff and Price responded differently to their supervisors' criticisms of their conduct. With respect to Plaintiff, as set forth at page 7, *supra,* Sutcliffe told Plaintiff to apologize to Kelly Dale for having raised her voice, but according to Sutcliffe, Plaintiff refused to apologize at that time. [18] Plaintiff testified she had no recollection as to whether or not she refused to apologize at that time. [19] Sutcliffe testified that she then spoke with Morgan, who told Sutcliffe that Stevens had to apologize or be issued a written warning and be required to leave the premises. [20] Sutcliffe testified that, because Stevens refused a direct order to go home, on Morgan's instruction, Sutcliffe issued a written warning for Plaintiff, which Plaintiff refused to sign until after speaking with Morgan. [21] Plaintiff admits that when Sutcliffe left, Plaintiff slammed the door behind her. [22] After a heated discussion with Morgan, Stevens refused a direct order to leave the premises. Stevens signed the written warning after being informed by Morgan that she would be terminated if she continued to refuse to do so. [23] Because Stevens refused to leave, Morgan realized she "had a Human Resources issue" and, therefore, Morgan told Stevens that she was to "stay in [her] office and

**15.** Plaintiff. Dep. 153:19–24.

**16.** Price Decl. ¶ 8.

**17.** Plaintiff. Dep. 141:14–21.

**18.** Sutcliffe Dep. 48:22–23.

**19.** Plaintiff. Dep. 147:17–25.

**20.** Morgan Dep. 19:22–20:4; Sutcliffe Dep. 49:8–12.

**21.** Morgan Dep. 20:14–19; Sutcliffe Dep. 50:7–51:15.

**22.** Plaintiff. Dep. 145:23–24; Sutcliffe Dep. 47:22–25; Morgan Dep. 20:10–12.

**23.** Morgan Dep. 20:18–21:19; Plaintiff. Dep. 148:2–5.

[she was] not to leave. [She was] not to talk to anyone."[24]

In contrast, after Price was reprimanded by Morgan, he did not respond by raising his voice to her; he did not slam the door behind her; and he did not refuse a direct order by her. Thus, Price's conduct did not come close to the level of seriousness of that of Plaintiff's conduct. Unlike Plaintiff, Price apologized immediately to the persons he yelled at, and subsequently bought lunch for the entire Contracts Department staff.[25] Furthermore, there is no evidence that Price had any other disciplinary problems of any kind. There are significant differences between Plaintiff's conduct and Price's conduct, and therefore the court concludes that Price is not a similarly situated male counterpart.

The third male whom Plaintiff identifies as being "similarly situated" is Nick Barnum, who, during Plaintiff's employment with Defendant, used profanity during a meeting with Morgan, Sutcliffe and Cain concerning a dispute over commissions. Barnum was verbally reprimanded by Morgan and told that if he ever spoke like that again he would be terminated. Unlike Plaintiff, Barnum did not argue with management, he did not cause the incident to escalate by attempting discussion, and he did not refuse a direct order. Barnum apologized for his conduct "because [he] knew [he] should not have made that [profane] statement."[26] Sometime thereafter, Barnum failed to complete necessary pa-

perwork on behalf of a single customer. Because he had already received a verbal warning, Barnum was given a written warning and put on thirty-day probation for failure to follow procedures. Thus, Plaintiff and Barnum each received a verbal warning followed by a written warning and probation for further misconduct. Even putting aside the issue whether Barnum's conduct was more egregious or "less egregious" than Plaintiff's conduct, it remains that after Barnum received the written warning, he did not commit any other infractions requiring further disciplinary action or termination.[27]

As to the third prong, Plaintiff argues that the disciplinary measures enforced against her were more severe than those enforced against those other employees. Plaintiff argues that Barnum was told to shape up, and later was removed from probation, while Plaintiff was filed after being put on probation, leading Plaintiff to conclude that the disciplinary measures were not equally enforced against Plaintiff and Barnum. Plaintiff's conclusion, however, fails to apprehend the fact that the Plaintiff engaged in conduct different from that of Barnum, Price, or the unnamed male associate; the different conduct put each person on a different path of disciplinary measures. Stevens was terminated because after being placed on probation, she continued to engage in unacceptable behavior.[28] Therefore, the court is of the opinion that the evidence

24. Morgan Dep. 21:9–19.

25. Morgan Dep. 31:24–32:6.

26. Barnum Decl. ¶ 8, attached as Exhibit P to Defendant's Memorandum.

27. The record reflects that another male sales associate, Jack Tuney, was also given a written warning and put on a three year period of probation for improperly selling real estate personally owned by him to a client of Defen-

dant. Following this incident, Tuney engaged in no actions that warranted further disciplinary action. Tuney's discipline and the beginning of his probationary period pre-dated Morgan becoming Sales Manager.

28. Sutcliffe Dep. 40:22–41:13, 65:15–25, Ex. 6, Response to Interrogatory No. 6; Pl. Dep. 184:5–8, 184:13–14.

demonstrates that Stevens was not subject to disparate discipline.

Even if this court were to determine that the prohibited conduct in which Plaintiff engaged was comparable in seriousness to the misconduct of the three male employees, Plaintiff still must prove that the Defendant's disciplinary measures enforced against her were more severe than those enforced against those other employees. From the facts of this case, Plaintiff cannot make this showing. First, the unnamed male sales associate with a substance abuse problem was terminated for failing to abide by the rules of the EAP. This sales associate was not treated more favorably than Plaintiff.

Both Plaintiff and Price were given verbal warnings; Plaintiff for her conduct toward the design center staff, and Price for his conduct toward the Contracts Department staff. However, this is where the actions of Plaintiff and Price diverge. It was not until Plaintiff refused to apologize and slammed her office door behind her supervisor that she was issued a written warning. Because Plaintiff engaged in misconduct of greater seriousness and extent than Price, who immediately apologized for his conduct, the court cannot find that Price received more favorable treatment because he received only a verbal warning. Price did not refuse a direct order from his supervisor to apologize, and he did not slam a door after his supervisor.

Lastly, the facts of the case do not show that Barnum received more favorable treatment than Plaintiff with regard to the enforcement of disciplinary measures against him. Barnum received a verbal warning for using profanity in a dispute with his supervisors over commissions, and thereafter, Barnum apologized for his misconduct. Next, Barnum failed to follow Defendant's procedures when he failed to complete required paperwork. Because Barnum had already been given a verbal warning for prior misconduct, he was given a written warning and placed on probation. However, Barnum did not engage in any further misconduct which would have caused him to be disciplined, and therefore, was not terminated.

In contrast to Barnum, Plaintiff received a verbal warning for her confrontational conversation with Design Center employees, but she refused to apologize and slammed the door behind her supervisor. As a result, Plaintiff was issued a written warning.[29] However, unlike Barnum, after Plaintiff received the written warning, she received four complaints from customers and was involved in a confrontation with a co-worker before she was terminated.[30]

As this record reflects, Plaintiff cannot show that there were any "similarly situated" male sales associates. Even if the male associates had been similarly situated, it does not appear from the record before the court that any male sales associate was given more favorable treatment than Plaintiff. Instead, male sales associates who engaged in misconduct were disciplined in a manner consistent with Defendant's policy and in relation to the seriousness and extent of the misconduct. Plaintiff's misconduct also was disciplined in a manner consistent with Defendant's policy; the difference, however, is that the seriousness and extent of

29. After being issued the written warning, Plaintiff still refused to go home as her supervisor ordered. (Morgan Dep. 20:18–21:19; Plaintiff. Dep. 148:2–5.) While her supervisors would have been well within their rights to terminated her that day, they did not.

30. Sutcliffe Dep. 40:22–41:13, 65:15–25, Ex. 6, Response to Interrogatory No. 6; Plaintiff. Dep. 184:5–8, 184:13–14.

Plaintiff's misconduct surpassed that of her co-workers.[31] As Plaintiff testified, "If two employees engage in two different behaviors ... a manager has the right to take two different disciplinary actions."[32] Because Plaintiff cannot demonstrate that similarly situated male sales associates were treated more favorably, Plaintiff has not set forth a genuine issue of material fact as to whether she was treated differently with regard to her verbal and written warnings. *See Gaither v. Wake Forest Univ.,* 129 F.Supp.2d 863, 869 (M.D.N.C.2000) ("The Fourth Circuit has held that summary judgment for the employer is proper under a discriminatory enforcement claim where the plaintiff has not proffered sufficient evidence that similarly situated white employees were treated more favorably", citing *Cook,* 988 F.2d at 512).

### 2. Whether there is evidence that Stevens failed to meet the terms of her probation

Next, Plaintiff contends that there is no evidence that she failed to meet the terms of her probation. The terms of Stevens' 30 day probation required her to "be able to control her emotions when discussing problems within our work environment[.]" Neither Sutcliffe nor Morgan could articulate any reason that Stevens had not met the terms of probation. Morgan testified that the Design Center incident which triggered the discipline was the only instance she knew of where Stevens yelled. Furthermore, Morgan testified she did not know whether Stevens was making an attempt to modify her behavior toward co-workers.[33]

In response to Plaintiff's second argument, Defendant believes that the facts not in controversy demonstrate ample cause for Stevens' termination, as the record shows that Stevens was terminated for being argumentative during weekly sales meetings; acting demeaning and condescending to other employees; engaging in heated discussions with co-workers and supervisors; ignoring management instructions; and improperly handling customers. At the time of her termination, Sutcliffe "read [Stevens] every single document that was in her file, and told her it was unsatisfactory." These documents are part of the record, and Defendant has never deviated from its reasons for Stevens' termination. Sutcliffe testified that interaction with customers was part of the Defendant's work environment, and Stevens received at least three customer complaints following her written warning. Further, Defendant argues that the facts not in controversy show that Defendant received a complaint from co-worker Heddy McCraw of mistreatment by Stevens during the same time frame as Stevens' confrontations with management, the Design Center staff, and her written warning; and that after Stevens' written warning, Defendant received a complaint from co-worker Jody Hurley of mistreatment by Stevens. Thus, Defendant believes that Stevens' failure to meet the legitimate expectations of her employer cannot be disputed.

Moreover, Defendant believes that whether Stevens failed to meet the terms of her probation is irrelevant. Stevens was expected to maintain a satisfactory performance, whether or not she was on probation. The fact that Defendant be-

---

**31.** Plaintiff. Dep. 99:12–18, 182:13–23, 183:16–19, Ex. 20, 22, 23, 24, 27; Sutcliffe Dep. 36:22–37:3, Sutcliffe Decl. ¶ 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15; Morgan Dep. 29:2–22, Morgan Decl. ¶ 5, 8, 9, 10, 11, 12; Cain Decl. ¶ 4, 5, 6, 7.

**32.** Plaintiff. Dep. 47:24–48:4.

**33.** *See* Joint Factual Brief at 29.

came aware of so many performance issues in such a short period of time, some of which were not included in a written warning, does nothing to demonstrate that Plaintiff's termination was a pretext for sex discrimination.[34]

### 3. Whether the "complaints" put into Stevens' personnel file and made a basis for her termination are in dispute.

Plaintiff agrees that the complaint Defendant received from Mr. Christianson was discussed with Plaintiff, and Plaintiff admitted that she failed to complete the paperwork necessary to hold the lot, and never provided Christianson with a contract to purchase the lot, which resulted in the lot being sold to another customer. Thus, this complaint is not in controversy.

However, Plaintiff disputes the other three complaints. Joanne Sutcliffe wrote a note to the personnel file of Susan Stevens on August 9, 2004 documenting a complaint by Mr. and Mrs. Steger. Stevens was not informed about this note until termination and disputes this complaint. Second, Dorothy Apgar wrote a letter to Stevens' personnel file documenting a conversation with a Mr. and Mrs. Crabtree on August 11, 2004. Stevens was not informed about this letter until termination, and Stevens disputes the complaint. Third, on Saturday, July 10, 2004 Joanne Sutcliffe wrote an email to Joyce Darveau with the subject: Susan Stevens– Personnel File. This documented that Heddy McCraw came into her office and was upset because Stevens was abrupt and directive toward her. Again, this was not disclosed to Stevens until termination. Stevens disputes this version of the incident. Morgan testified that the usual policy after a customer complaint is to counsel the sales associate. Morgan counseled Stevens with regard to only one of the four

complaints. The other three complaints were not discussed with Stevens until her termination.[35]

In response, Defendant believes the complaints placed in Stevens' personnel file cannot be in dispute because the Defendant has provided documentation proving the existence of such complaints. Stevens testified that she was not able to specifically recall the other three customer complaints, but as Defendant argues, Stevens' lack of recollection does not mean the complaints did not occur. Without any evidence to the contrary, Defendant believes the customer complaints speak for themselves and cannot be in controversy. Moreover, with respect to the complaints Defendant received from co-workers Heddy McCraw and Jody Hurley, Defendant believes that the Undisputed Facts, including Stevens' own testimony, demonstrate that Stevens was involved in conflicts with each of these co-workers. While Stevens may not have believed that these complaints were serious, it does not change the fact that Defendant, in fact, received these complaints about Stevens' relationships with her co-workers.

Finally, Defendant contends that the fact that Stevens was not counseled over each of these complaints is irrelevant. Morgan testified that she did not always counsel sales associates when they received such complaints. However, Morgan did, in fact, counsel Plaintiff with respect to one of the customer complaints. This counseling is not in dispute. Similarly, Sutcliffe testified that, depending on the situation, she would sometimes put complaints in a sales associate's personnel file without first discussing the complaint with that associate. Thus, Defendant argues it was not unusual for Stevens not to be

---

**34.** *See* Joint Factual Brief at 33–34.

**35.** *See* Joint Factual Brief at 29–30.

counseled regarding each of the complaints placed in her personnel file.[36]

#### 4. Whether the reason given for Stevens' termination is in dispute

Plaintiff argues she was fired for being aggressive and not being a team player. Although it was admitted that male sales associates were sometimes aggressive, no male sales associate was fired for aggressive behavior. Morgan testified that Greg Price was aggressive. Price was verbally warned by Morgan after he blew up at co-workers but Morgan did not write him up. Asked whether the males were written up for aggressive behavior, Sutcliffe said "probably ... they were reprimanded ... or they kind of calmed down".

Defendant agrees that Stevens was, in part, "ultimately fired for being aggressive and not being a team player." More specifically, as Defendant argues, based upon the Undisputed Facts, Stevens was terminated for being argumentative during weekly sales meetings; acting demeaning and condescending to other employees; engaging in heated discussions with co-workers and supervisors; ignoring management instructions; and improperly handling customers.[37]

With respect to defining a "team player," Sutcliffe said a team player interacts with co-workers, helps others, are pleasant, and are nonaggressive. Tuney said Stevens was very pleasant to him and he never observed Stevens treating anyone in a disrespectful manner. Richardson believed Stevens behaved in a pleasant manner toward other sales people. Cadman though Stevens was well liked, willing to help and never observed Stevens being disrespectful or acting in a demeaning manner to anyone. Art Kelly, Stevens' partner, said she was well liked and a team player, helpful to others and treated others with respect.[38]

Defendant contends that the facts demonstrate that Plaintiff was not a "team player" because she did not interact well with her co-workers, she was unpleasant, and she was aggressive, as reflected by the various conflicts involving co-workers, supervisors, and customers. Defendant argues that the fact that some of Plaintiff's co-workers testified that she was a "team player" is irrelevant. Indeed, it is well settled in the Fourth Circuit that the opinions of co-workers are irrelevant in assessing a plaintiff's performance. Only the opinions of the employer are relevant. *See, e.g., King v. Rumsfeld,* 328 F.3d 145, 149 (4th Cir.2003); *Tinsley v. First Union Nat. Bank,* 155 F.3d 435, 444–445 (4th Cir.1998); *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 280 (4th Cir.2000).

Therefore, it is recommended that Defendant be granted summary judgment as to Plaintiff's claim as to sex discrimination in the enforcement of discipline.

#### D. Whether Plaintiff can Establish a prima facie case of Gender Discrimination with respect to her termination.

Finally, in order for Plaintiff to disprove Defendant's legitimate, non-discriminatory explanations for the disciplinary actions and discharge, she must show that these actions would not have occurred "but for" her sex. *Eduardo Vazquez v. Maryland Port Admin.,* 937 F.Supp. 517, 520 (D.Md.

---

**36.** *See* Joint Factual Brief at 34–36.

**37.** Sutcliffe Dep. 40:22–41:13, 65:15–25, Ex. 6, Response to Interrogatory No. 6; Pl. Dep. 184:13–14.

**38.** *See* Joint Factual Brief at 30–31.

1995), *citing Burdine*, 450 U.S. at 254, 101 S.Ct. 1089 and *Ross*, 759 F.2d at 365–66.

Plaintiff testified in her deposition that the discrimination was "subtle", explaining: "This is subtle sex discrimination ... It is the kind of discrimination that you feel just by innuendo and looks that you get in the hall and passing little comments that probably really don't in and of themselves mean anything." [39] This testimony suggested to the court that Plaintiff would use indirect evidence to set forth her *prima facie* case. If Plaintiff cannot present direct evidence of gender discrimination, she must establish a *prima facie* case of discrimination by satisfying the four-prong, indirect proof scheme set forth in *McDonnell Douglas*. To do so, Plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met the Defendant's legitimate job expectations; and (4) her position remained open or was filled by a similarly qualified individual outside of the protected class. *See St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. 2742; *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315 (4th Cir.1993). If Plaintiff can prove a *prima facie* case under the *McDonnell Douglas* test, the burden then shifts to the Defendant to show a legitimate, nondiscriminatory reason for the adverse action. *Id.* The defendant's burden is one of production, rather than proof, and it "need not persuade the court that it was actually motivated by the proffered rea-

sons." *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. If the defendant carries its burden of production, any presumptions created by the *prima facie* showing are removed and the burden of proof shifts back to the Plaintiff to prove, by a preponderance of the evidence, that the Defendant's proffered reason is a pretext for discrimination. *Burdine, see also Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). To prove pretext, the plaintiff must show that the defendant's reason was both false and that the real reason was discrimination. *St. Mary's Honor Center*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The ultimate burden always rests with the Plaintiff to show that the adverse employment actions were taken on the basis of the alleged discrimination. *Id.*

Although Plaintiff indicated that she would prove her case through indirect evidence, the court notes that in Plaintiff's Reply to Defendant's Memorandum in support of its Motion for Summary Judgment, Plaintiff argues that there exists direct evidence of discrimination because she "was fired for being 'aggressive' and not a 'team player'".[40] In support of this argument, Plaintiff points to testimony that both her supervisor, Morgan, and her Sales Manager, Sutcliffe, agreed that aggressiveness was a good quality for a sales associate to possess, and that Morgan agreed that Greg Price, a male sales associate, was "aggressive".[41] Plaintiff argues that the testimony of Morgan and Sutcliffe

**39.** Plaintiff. Dep. 194:8–19.

**40.** Pl.'s Memorandum [16–2] at 11.

**41.** Pl.'s Memorandum [16–2] at 11. Plaintiff relies upon the United States Supreme Court's dicta in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plurality opinion written by Justice Brennan, with three Justices

concurring and two Justices concurring in judgment. The pertinent language quoted by Plaintiff is as follows: "An employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind."

is direct evidence of discrimination in the form of disparate treatment of an "aggressive" man (Price), and Plaintiff. As discussed above, however, the court has determined that there were many differences in the "aggressive" behavior of Price and Plaintiff. Thus, the court does not find that Plaintiff has set forth direct evidence of discrimination. It appears that the only other possible direct evidence identified by Stevens to support her claim of sex discrimination was Morgan telling her to "come up here and sit on the stool" during the sales meeting and Morgan "reaming [her] after the written warning incident and telling [her] how [Morgan] hated [her], how the managers hated [her]. How [Stevens] wasn't a team player. And [she was] thinking to [herself], not, that is not being—again, it is subtle. It is not an in your face, grab your breast kind of thing. It is a—[Morgan] sat in [Stevens'] office and ripped [Stevens] a new one for a half-hour, and [she knew Morgan] never did that to a guy; not while [Stevens] was there anyhow." [42]

Stevens' co-workers, which appear to include all of those who worked with Stevens during Plaintiff's employment with Defendant, testified that Defendant does not discriminate on the basis of sex.[43] All three of Plaintiff's supervisors were female; Stevens does not believe that two of her three supervisors, Joanne Sutcliffe or Elizabeth Cain, subjected her to any unlawful sex

discrimination. Morgan was responsible for hiring Stevens, and was involved in the decision to terminate Stevens approximately twenty months later. As this Circuit has recognized, "[w]hen the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991). Four of Stevens' female co-workers testified that they believed Morgan to be a good manager.

Plaintiff relies upon the testimony of Donna MacDonald [44] as a basis for arguing that Morgan treated male sales associates more favorably than female sales associates.[45] This court is aware that in making a recommendation to the District Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir.), *cert. denied*, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987) (internal quotation omitted). "Genuineness means that the evidence must create fair doubt[.]" *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). MacDonald's statement, standing alone, does not raise a genuine issue of material fact, given the testimony of other

---

42. Plaintiff. Dep. 195:14–23, 196:8–11, 197:4–8.

43. Barnum Decl. ¶¶ 10, 11; McCall Decl. ¶¶ 12, 13; Ostas Decl. ¶¶ 10, 11; Price Decl. ¶¶ 11, 12; Turpin Decl. ¶¶ 15, 16; Richardson Dep. 11:23–12:5, 16:5–13; Windham Dep. 19:22–24; Kelly Dep. 18:22–19:3; Cadman Dep. 25:4–17; Tuney Dep. 16:22–25.

44. MacDonald never worked with Plaintiff but MacDonald went on leave before Plaintiff's first day of employment. (Morgan Second Decl. ¶ 7).

45. Plaintiff can point to no instance in which any one of Defendant's managers, all of whom were female, made any comments actually indicating gender animus. Nor can Plaintiff show that the disciplinary measures taken against her were improper. Plaintiff's sole evidence of gender bias on the part of Defendant seems to be her contention that Morgan would "flirt" with male sales associates, but not with female sales associates. However, this belief, even if true, hardly constitutes evidence of gender discrimination.

witnesses. Furthermore, as stated above, "[a] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir.1989) (citation omitted). "Generalized testimony by an employee regarding [her] subjective belief that the adverse action was the result of discrimination is insufficient to make an issue for the jury in the face of proof showing an adequate, nondiscriminatory reason for the action." *Williams*, 871 F.2d at 459.

In the alternative, Plaintiff argues that if the direct evidence of discrimination is not persuasive, Plaintiff will proceed with showing discrimination by Defendant based upon circumstantial, or indirect evidence as set forth by the burden-shifting *McDonnell Douglas* paradigm of analysis.[46] With respect to the *McDonnell Douglas* analysis, Plaintiff has satisfied the first two prongs. As to the third prong, however, the question is whether Plaintiff performed her job duties at a level that met the Defendant's legitimate job expectations at the time of the adverse employment action. Plaintiff testified that she understood she was required to "communicate properly to the appropriate departments any customer request for information or services," as well as to "work efficiently and cheerfully in an environment which may be stressful due to adversarial situations resulting from the performance of the department's mission." Plaintiff also testified that she believed a company had the right to expect employees to treat customers and co-workers with respect. In support of her argument that Plaintiff was performing her job

duties at the level expected by Defendant, Plaintiff relies upon the fact that Defendant does not dispute that Stevens was a top performer in sales. However, Plaintiff's own opinion cannot establish a genuine issue of material fact as to whether she was meeting her employer's expectations. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir.2003) ("King's own testimony, of course, cannot establish a genuine issue as to whether King was meeting [the employer's] expectations."); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir.1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (citations omitted). Furthermore, in determining whether a plaintiff was meeting his or her employer's expectations with respect to job performance, it is not enough to focus solely on Plaintiff's sales with her partner, Art Kelly. Instead, a plaintiff's performance record should be examined in its entirety. *Karpel v. Inova Health System Services*, 134 F.3d 1222, 1228 (4th Cir.1998) ("It would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum; it is the conglomeration of these issues that made [plaintiff] an unsatisfactory employee that [the employer] was justified in terminating.") (internal citation omitted) Thus, this court would be remiss in focusing only on Plaintiff's sales performance while ignoring her performance and disciplinary problems.

Although Plaintiff attempts to rebut Defendant's claim that she was terminated because her behavior was unsatisfactory by relying upon the opinions of her co-workers to show that she was pleasant and, in fact, was a team player,[47] the opin-

---

**46.** Pl.'s Reply [16–2] at 11–12

**47.** *See* Pl.'s Memo. at 16, citing Tuney Dep. 6:2–23; Windham Dep. 36:5–8; Richardson

Dep. 25:13–17; Cadman Dep. 7:8–25; 8:2–11; Kelly Dep. 12:11–24.

ions of some of Plaintiff's co-workers are not relevant to the question whether Plaintiff's supervisors believed she was meeting the Defendant's expectations. *See Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 444–445 (4th Cir.1998) ("[A]lthough ... certain co-workers, Bank customers and attorneys believed [plaintiff] was doing a good job, they fail to address whether management honestly believed that [plaintiff] was doing a good job. It is the perception of the decision maker which is relevant[.]"); *King*, 328 F.3d at 149; *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir.2000) ("The alleged opinions of [plaintiff's] co-workers as to the quality of her work are [ ] close to irrelevant.")

The Defendant argues that Plaintiff failed to meet its legitimate job expectations. To support this contention, Defendant argues that Plaintiff received numerous complaints from co-workers and customers and was disciplined, both formally and informally, for confrontations with co-workers, managers and customers. Further, Plaintiff's March 31, 2004 performance review shows that she was not meeting Defendant's legitimate expectations, as the review showed she needed to improve her performance in five areas. According to Morgan, despite the fact that Plaintiff was meeting her sales goals, Plaintiff was not a good employee because Plaintiff had to improve in five areas identified in the evaluation.

Plaintiff has set forth no evidence that any male sales associate received the same or a similar number of complaints from co-workers, supervisors and customers.[48] Likewise, Plaintiff has set forth no evidence to show that other sales associates refused direct orders from management such as the direct order for Plaintiff to leave the premises.[49] Simply stated, Plain-

tiff's job performance was unsatisfactory, and was unmatched by any other employee. Thus, Plaintiff has failed to show, with respect to the third prong of the *McDonnell Douglas* test, that she was performing her job adequately and meeting her employer's expectations.

Even assuming, *arguendo*, that Plaintiff satisfied the third prong of the *McDonnell Douglas* test and was performing at a level that met the Defendant's legitimate job expectations at the time of the adverse employment action, Plaintiff has failed to put forth any evidence whatsoever with respect to the fourth prong of the test: that her position remained open or was filled by a similarly qualified individual outside of the protected class.[50] It is Plaintiff's burden to present this evidence to establish a prima facie case of discriminatory discharge, and she has failed to do so.

In the present case, Plaintiff has not forecast evidence sufficient to support her claim for discriminatory discharge or discriminatory enforcement of disciplinary measures. Because Plaintiff has not presented direct evidence of discrimination, and has not established a *prima facie* case of discrimination by satisfying the indirect proof scheme set forth in *McDonnell Douglas*, her claims cannot survive Defendant's motion for summary judgment.

## CONCLUSION

For the aforementioned reasons, **it is recommended that Defendant's Motion for Summary Judgment [15–1] be granted.**

---

48. Plaintiff. Dep. 180:14–19.

49. Plaintiff. Dep. 196; 24–197:3.

50. *See* Plaintiff's Memorandum [16–2] at 15–17.